ROBERT R. POWELL, ESQ.
DENNIS R. INGOLS, ESQ.
**LAW OFFICES OF ROBERT R. POWELL**
925 West Hedding Street
San José, California 95126
T: 408-553-0200
F: 408-553-0203
E: rpowell@rrpassociates.com

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA
(San Jose Division)

| | |
|---|---|
| IESHA SMITH, STEPHEN SMITH, individually and as Guardian Ad Litem for his minor children, N.S., C.S1, J.S., A.S., T.S., C.S2, M.S., <br><br> Plaintiffs, <br><br> v. <br><br> CITY OF SAN JOSE, OFFICER BRAVO-CARNEY, individually and as an employee of the City of San Jose, COUNTY OF SANTA CLARA, COLLEEN SEXTON, individually and as an employee of the County of Santa Clara FELICIA AQUINO, LINDA ADAMS, DOES 1 – 20, inclusive, <br><br> Defendants. | Case No. C 07 04310 HRL <br><br> COMPLAINT FOR VIOLATION OF CIVIL RIGHTS (42 U.S.C. 1983), INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS, TRESPASS, CONVERSION, DEFAMATION <br><br> DEMAND FOR JURY TRIAL |



FILED

*and E-FILING*

2007 AUG 21 P 3: 55

RICHARD W. WIEKING
CLERK
U.S. DISTRICT COURT
NO. DIST. OF CA. S.J.

#5
Fee Pd
SI

# I.

## JURISDICTION AND INTRADISTRICT ASSIGNMENT

1.    **JURISDICTION.** Plaintiffs bring this civil rights lawsuit pursuant to 42 U.S.C. Section 1983 to redress the deprivation by defendants, at all times herein acting under color of law, of rights secured to plaintiffs under the United States Constitution, including the First, Fourth, Fifth, and Fourteenth Amendments, and under federal law.

2.    Jurisdiction is confered on this Court by 28 U.S.C. section 1343(3) and 1343(4), which provide for original jurisdiction in this Court of all suits brought pursuant to 42 U.S.C. Section 1983. Jurisdiction is also conferred by 28 U.S.C. Section 1331(a) because claims for relief derive from the United States Constitution and the laws of the United States.

3.    **INTRADISTRICT ASSIGNMENT.** Venue properly lies in the Northern District of California, San Jose Division, pursuant to 28 U.S.C. Sections 1391 and 1392 and Local Rule 3-2(e), in that the events and circumstances herein alleged occurred in the County of Santa Clara, and at least one defendant resides in the County of Santa Clara.

4.    This Court has supplemental jurisdiction over plaintiff's state law causes of action pursuant to 28 U.S.C. § 1367(a).

5.    The minor plaintiffs T.S., C.S2., and M.S. have not submitted a claim to the Foster Home and Small Family Home Insurance Fund ("Fund") established by California Health and Safety Code Section 1527 et seq., as the claims for the theft and/or conversion of their personal property by the foster parent Linda Adams named hereinbelow is a liability the nature of which is not covered by the Fund, pursuant to H&S Code Section 1573(a). However, said plaintiffs reserve the right to make such application if a court of competent

2

jurisdiction determines such filing is a necessary prerequisite to maintaing said plaintiffs

claims for conversion.

## II.

## PARTIES

6.     Plaintiffs IESHA SMITH ("IESHA") and plaintiff STEPHEN SMITH ("STEPHEN"),

at all times relevant herein, were married adults and parents of the following minor children,

N.S., born 12-28-89, C.S1, born 3-31-92, J.S., born 10-10-95, A.S., born 6-9-97, T.S., born 5-

26-99, C.S2., born 12-31-00, M.S. born 12-31-00, and D.S., born 6-28-06.  At all relevant

times herein, the plaintiffs were residents of Santa Clara County.  The plaintiffs will

collectively be referred to herein as "PLAINTIFFS," the parents collectively as Mr. & Mrs.

Smith, and the children collectively as the MINOR PLAINTIFFS.

7.     D.S. is not a plaintiff in this action on any claim for relief as she was not born at the

time of the events complained of herein.

8.     STEPHEN SMITH JR. is and was an adult son of Mr. and Mrs. Smith and a sibling who

resided with all of the other siblings, and whose rights of familial association with all of his

then living siblings were also violated by the actions of defendants as more specifically set

forth hereinbelow.  He is included in the term PLAINTIFFS, with regard to each claim for

relief designated as consisting of Mr. and Mrs. Smith as plaintiffs.

9.     All PLAINTIFFS enjoyed the company, companionship, and society with each other,

and all other benefits and burdens of the rights of familial association, at all relevant times,

prior to the involvement of defendants in their lives.

10.    Defendant CITY OF SAN JOSE ("CITY") is a municipality in corporate form,

organized and existing under the laws of the State of California, and has as an administrative

3

subunit thereof, the SAN JOSE POLICE DEPARTMENT ("S.J.P.D."). The CITY related

entities will be referred to collectively as CITY herein.

11.    The S.J.P.D. is a governmental law enforcement agency organized and existing

pursuant to the law, rules, regulations, and policies of defendant CITY, and either CITYor

S.J.P.D. promulgated, encouraged, ignored, ratified and/or permitted, the policies, patterns,

customs and practices under which the individual defendants, and Does 1 – 50, committed the

acts or omissions complained of herein, and the entities which condoned, ratified, and

encouraged the conduct of the police officer defendants, as complained of herein.

12.    As the employer of police officers and their supervisors, CITY and/or S.J.P.D. had

primary responsibility for the training, education, and supervision of police officers, as well as

other S.J.P.D. personnel, and S.J.P.D. supervisors, and provided inadequate and ineffective

training of S.J.P.D. personnel to such a degree as to manifest deliberate indifference to the

constitutional rights of families and persons within the jurisdiction of S.J.P.D., and

constituting a driving force behind violations of individuals rights and the damages therefrom.

Said inadequate training includes, but is not limited to, 1.) the failure to train police officers

on the constitutional rights of familial association, 2.) the failure to train police officers on the

availability under state law to obtain a protective custody warrant for the removal of a minor

child/children, 3.) the failure to train police officers on the procedures and requirements that

must be met to obtain a protective custody warrant for the removal of a minor child/children.

13.    PLAINTIFFS contend that policies, practices, customs and procedures of CITY,

whether written or unwritten, which were a significant driving force behind the claims of

PLAINTIFFS herein, include but are not limited to, 1.) the routine removal of children who

are not in imminent risk of serious bodily injury, nor who are in need of medical care or living

in an environment / circumstances that present a risk of harm or illness without first acquiring

a warrant when there is more than sufficient time in which to obtain a warrant, 2.) the practice

of carrying on their person items intended to appear to be paraphanelia and/or illegal drugs in

order to deceive suspects into believing the officers have already found contraband, to provide

the officers additional leverage to oppressive and aggressive interrogation techniques, and

ultimately designed to force the suspect to "admit" knowledge of the contraband or other

potentially criminal activity, and, 3.) the routine violation of persons rights under the 4th

Amendment, by performing unlawful searches without consent or exigent circumstances,

and/or performing arrests as a pre-text to a search that has been declined by the owner of the

premises or property searched.

14.    PLAINTIFFS contend that the aforesaid inadequate training and such practices

constitute a basis for governmental liability for CITY in this case pursuant to the *Monell*

theory of liability, and hereby seek to hold CITY responsible in whole or in part for the

conduct of the individual defendants herein named.  Other practices, customs, policies and

procedures of CITY which PLAINTIFFS contend are also evidence of, or otherwise reflect

deliberate indifference to the citizens of CITY, and upon which liability may be founded as

well, are set forth hereinbelow.

15.    Defendant police officer CARNEY-BRAVO (first name unknown, hereinafter

"BRAVO"), whose acts as alleged herein were performed in her individual capacity and/or in

her official capacity under color of state law, was at all times material hereto a police officer

employee of CITY with S.J.P.D.

16.    Defendant police officer Doe 1 is a male police officer whose acts as alleged herein

were performed in his individual capacity and/or in his official capacity under color of state

5

law, was at all times material hereto, a police officer employee of CITY with S.J.P.D., and upon PLAINTIFFS information and belief, a patrol partner with BRAVO on the date and time of removal of the minor plaintiffs described hereinbelow.

17.    Defendant COUNTY OF SANTA CLARA ("COUNTY") is a municipality in corporate form, organized and existing under the laws of the State of California, and has as an administrative subunit thereof, the SOCIAL SERVICES AGENCY OF SANTA CLARA COUNTY ("SSA").

18.    The SSA is a county governmental agency organized and existing pursuant to the law and policies of COUNTY, and promulgates, encourages, and/or permits, the policies, patterns, and practices pursuant to which, or in contravention of which, the individual defendant social worker employees of COUNTY committed the acts or omissions complained of herein.

19.    CHILD PROTECTIVE SERVICES ("CPS") is a department within SSA's Department of Family and Children's Services ("DFCS") and is alone, or in conjunction with COUNTY, DFCS and SSA, responsible for the promulgation of policies, patterns, and practices pursuant to which, or in contravention of which, the individual defendant social worker employees of COUNTY committed the acts or omissions complained of herein.

20.    PLAINTIFFS contend that policies, practices, customs and procedures of COUNTY, whether written or unwritten, which were a significant driving force behind the claims of PLAINTIFFS herein, include but are not limited to, 1.) the routine failure to perform any meaningful investigation of the circumstances of the removal of children by law enforcement for purposes of determining if they actually are/were in imminent risk of serious bodily injury when removed, or can be returned to one parent of the other, or both., and, 2.) the routine fabrication of false evidence and repeated misrepresentations, inclusive of failing or refusing

6

to provide exculpatory information learned or received to the court or the parents in a juvenile dependency matter, 3.) the routine use of threats and implied ultimatums conditioning the return of a parents child or children on separation from, the obtaining of restraining orders against, or divorce from, the other allegedly abusive parent in violation of the parents 1st and 14th Amendment rights of association.

21.     Said departmental agencies and/or employees, supervisors, agents, or executives thereof, are also responsible for the training, education, and supervision of social workers, supervisors, and emergency intake workers employed by CPS and/or DFCS, and provided training and education in such an inadequate and ineffective manner as to constitute deliberate indifference to the constitutional rights and safety of families and persons within the jurisdiction of COUNTY.

22.     PLAINTIFFS sue all agencies and departmental units of COUNTY under the designation of COUNTY herein, and COUNTY thereby.

23.     Defendant COLLEEN SEXTON ("SEXTON"), whose acts as alleged herein were performed in her individual capacity and/or in her official capacity under color of state law, was at all times material hereto a social worker employee of COUNTY.

24.     PLAINTIFFS are ignorant of the true names and identities of those defendants sued fictitiously herein as Does 1-20, inclusive. PLAINTIFFS are informed and believes and thereon alleges that said defendants participated in some manner, or failed to participate in some manner, which acts or failures to act were in some manner a proximate cause of the injuries complained of by PLAINTIFFS, and for which, whether by agreement, inadequate supervision, inadequate training, consent, ratification, or active participation, such Doe defendants are responsible and/or liable for the PLAINTIFFS' injuries and damages.

7

25.    PLAINTIFFS are informed and believe and, based upon such information and belief, allege that, at all times herein mentioned, each and every defendant was the agent and/or employee of their co-defendants, and each of them, and was acting within the scope, purpose and authority of that agency and/or employment and with the knowledge, permission and consent of said co-defendants, and each of them.

26.    Plaintiff is informed and believes, and thereon alleges, that each of the named individual defendants herein, did knowingly and willingly, with a common intent and scheme set forth in further detail herein below, conspire to injure plaintiffs, and to continue to deprive plaintiffs, and each of them, of their rights, liberties, and interests in the comfort, care, and association of/with each other, as such rights are afforded them under the California state constitution, and the United States constitution, and conspired generally to damage said plaintiffs and inflict great physical and emotional injury upon them, and were successful in doing so.

27.    FELICIA AQUINO ("AQUINO") is an individual who at all times relevant herein was a resident of Santa Clara County, and the landlord who leased to Mr. and Mrs. Smith the home in which the removal of their children occurred as alleged herein below.  Mr. and Mrs. Smith had a valid and binding lease signed by all parties at the time of the events complained of herein below.

28.    LINDA ADAMS ("ADAMS") is an individual who at all times relevant herein was a resident of Santa Clara County and served as a foster care parent to T.S., C.S2., and M.S. at the times relevant to these minor plaintiffs complaints herein.

8

## III.

## FACTS

29.    On Sunday, August 21, 2005, AQUINO showed up unannounced at the home of Mr. & Mrs. Smith and the minor plaintiffs.  Within weeks after insisting upon a signed a lease for the rental of the home rented by Mr. and Mrs. Smith, AQUINO insisted that the entire family move out.

30.    AQUINO had made a call to IESHA the night before asking IESHA to move her family from the home, and while IESHA had said they would be glad to seek another place to live, when AQUINO said she wanted them out the next day, IESHA flatly refused and pointed out to AQUINO that they had entered a lease and it was valid.

31.    PLAINTIFFS are informed and believe their refusal to accede to AQUINO's demands, led to AQUINO showing up at their door on the morning of August 21st, 2005, again demanding they vacate the home. Again Mr. and Mrs. Smith refused to leave and pointed out that they had a lease for the house and she could not remove them.  When asked why AQUINO was even demanding that they move, the only reason offered by AQUINO on several inquiries, was that she did not "like" them.

32.    When AQUINO left the home, she immediately contacted the S.J.P.D. and made false claims of child abuse and neglect against Mr. and Mrs. Smith, alleging among other things that they were physically abusive to their children, they did not feed their children, and they left their children unattended for hours at a time.  All of these claims were false.

33.    Shortly after AQUINO had been at the house, two S.J.P.D. police officers arrived at the home and met with AQUINO. Then AQUINO, who had no rights or privileges of entry into the home except in cases of emergency, opened a deadbolt lock she had placed on the front

door approximately three days prior - a lock to which only she had the key and had not

provided same to PLAINTIFFS - and let the police officers in the home without consent from

PLAINTIFFS.

34.    The police officers explained that AQUINO had made the foregoing claims of abuse

and neglect, and also that she wanted the PLAINTIFFS to move out of the house.  They spoke

to the minor children and asked them if they were in any kind of distress or if there were any

problems, and they all said "no."  They also looked around the house for a few minutes.  They

then left, but not without apologizing to IESHA for the inconvenience.

35.    The very next day, on August 22nd, 2005, AQUINO again called the S.J.P.D. and again

let them into the PLAINTIFFS' home unannounced.  The two officers who responded this day

were different then those that had responded the day prior.  Again the police officers spoke

with the children, asked them if there were any problems, and again the children told the

officers "no."

36.    This time, before leaving, the police officers lectured AQUINO, telling her that calling

them with bogus claims of neglect and abuse to try and get the PLAINTIFFS removed from

the home was not appreciated and a waste of their time.  They warned her that if she did it

again they would arrest her.  AQUINO was not deterred by this threat, and called the S.J.P.D.

the very next day.

37.    This time AQUINO claimed that the children had been left alone in the home

unsupervised.   The claim was false.

38.    Based on AQUINO's call, BRAVO and Doe 1 responded to the PLAINTIFFS home on

August 23rd, 2005.  IESHA first became aware of their presence in the home when a one of

the officers knocked on her bedroom door and one of the children opened it.

COMPLAINT
Smith v. San Jose

39. At the time, which was approximately 4:30 p.m., STEVEN was picking up two of the couple's children, one who got off of work at 4:30 p.m. and another at 5:00 p.m.

40. BRAVO and Doe 1 were in full police uniform, each with a loaded sidearm.

41. Doe 1 asked if all of the kids were in the room with IESHA. She replied that all of them were with the exception of C.S1., who was in the bathroom. Doe 1 asked IESHA to go get her from the bathroom. IESHA walked to the bathroom, knocked on the door and told C.S1. to hurry out and come to the bedroom.

42. When IESHA returned to the room from getting C.S1 out of the bathroom, she saw that Doe 1 was on his knees in the room digging through one of her bags while BRAVO stood at the door.

43. When Doe 1 saw IESHA standing near him, he asked her if she had identification. She replied that she did and it was sitting on top of the big bag he had his arms in at the time.

44. It was only at this point that Doe 1 explained why he was there, saying that they had received a call about the children being alone and not taken care of so he had to do a welfare check. Doe 1 offered no explanation, or authority, for his having entered the home at all, or having searched through IESHA's belongings, without a warrant.

45. Doe 1 and BRAVO then spoke with IESHA and the children for a few minutes, readily assessed they were fine and in no danger – and obviously not left unsupervised - and sensing the fear that this sudden intrusion and search had wrought on the PLAINTIFFS, and particularly the minor children, Doe 1 said that "nobody [was] going to jail" and that "everyone look[s] good and it seemed whoever called was lying." At that point BRAVO shook IESHA's hand and told her she was "doing a good job," and the officers turned and left the home.

11

46. After about ten minutes, the officers returned, and Doe 1 asked if he could write the children's names and ages down so that he had proof he had done a "welfare check." IESHA allowed the officers in and then she sat with BRAVO at the kitchen table and gave her the names and birthdates of the children.

47. However, as she was doing that, Doe 1 suddenly turned and walked out of the kitchen, and IESHA heard him enter the doorway of the bedroom and tell all of the children to get out of the room. She then heard the latch to the door close after Doe 1 closed the door.

48. Doe 1 emerged from the room a few minutes later and had a small piece of paper in his hand. He walked up to IESHA and said, "Look what I found," holding out in his hand the small paper which had obviously previously been folded up, but at this time was open and appeared to contain either salt or sugar.

49. IESHA looked at Doe 1 puzzled as to what he was showing her or what he was talking about, when suddenly Doe 1 yelled angrily, "Methamphetamine!" IESHA told Doe 1 she had never seen the item in his hand in her life and she did not do methamphetamine. This began a long and irate tirade by Doe 1.

50. First, Doe 1 accused IESHA of being on drugs at that moment, and she again responded telling him that she did not do drugs. Then, Doe 1 accused IESHA not only of being under the influence of drugs, but said that she had been a drug addict my entire life. Again, she told him that she was not on drugs and that she certainly wasn't a drug addict. The more IESHA denied the claims of Doe 1, the louder and angrier he got. All of the yelling he was doing, and claims of IESHA's being under the influence and a lifetime drug addict, was being done directly in front of all the minor plaintiffs.

COMPLAINT
Smith v. San Jose

51.    Although the substance which was shown to IESHA and was allegedly methamphetamine was a controlled substance, and was according to Doe 1 evidence of a crime alleged to have been committed by IESHA, Doe 1 simply took the small bindle of paper, folded it up, and tucked it in his shirt pocket. It was never turned into any drug laboratory for testing, and never booked into the evidence room of the S.J.P.D..

52.    IESHA then asked Doe 1 if he could give her a drug test. He said that he could, so IESHA requested that he do so.  In response, Doe 1 literally turned and faced the children and started yelling at the children about what a horrible mother IESHA was and how she had been addicted to drugs for years and that she was on drugs right then.  Every one of the claims were false, and Doe 1 had no basis for making any of the claims. Doe 1 then made IESHA stand up and turn around and he put handcuffs on her.

53.    Then Doe 1 turned and asked IESHA where she got the drugs. She continued to deny the drugs were hers and this appeared to simply make Doe 1 more angry.

54.    He then suddenly took  IESHA into the living room, away from the children and BRAVO, and whispered to IESHA that he was "not stupid." Doe 1 said that he knew IESHA was not on drugs. He said he knew the drugs weren't IESHA's. He said he had been a police officer for years. Now he wanted IESHA to admit that her husband STEPHEN was a drug addict, that the drugs were his and that he was beating up on her.  Doe 1 told her that telling him these things would, "make things better."

55.    IESHA stated that her husband was not on drugs, was not a drug addict, and certainly did not ever "beat" her.  She asked him how he could be saying these things about her husband when he doesn't even know the man? His answer was that he had been a cop for a

13

long time, and that he knew they were not IESHA's drugs, and he could "tell" that she was

afraid of her husband and that was why she was not admitting they were her husbands.

56.    At the time, IESHA simply assumed that this police officer was insane based on his

behavior.  However, she later learned that he in fact had a personal relationship of some sort

with AQUINO, and had grown up in the same neighborhood with her.

57.    STEPHEN SMITH JR., who was at the house after IESHA had been transported away,

but before the children had been removed, overheard AQUINO and Doe 1 talking about their

days as children in the neighborhood, and overheard AQUINO explaining how she had called

three times and tried to get Doe 1 to be the one to respond to the call, but they had told her

that they couldn't' send a specific officer and that is why she had continued to call – because

she knew he still worked the beat in that neighborhood.

58.    Doe 1's reply to IESHA's insistence that her husband was not a drug addict or an

abusive spouse, was that IESHA wasn't helping herself or her family by "covering things up

for STEPHEN."  IESHA continued to state she was innocent of all of Doe 1's claims, and told

him to just take her to the station so she could just do the drug test.

59.    He then said that if STEPHEN didn't come home, "I am going to take the kids."  He

said this about three times, and also turned to BRAVO after saying this on at least two of the

occasions, and said something to the effect of, "Don't call 'maritime."  IESHA does not know

if this was the name of a person, an agency, or a code for something only BRAVO and Doe 1

knew the meaning of.

60.    IESHA was asking him, "Why, why are you going to take my kids?"  She said, "I have

adult roommates.  The adult roommates included a registered nurse who was present and

14

crying and pleading with the officers not to remove the children and that she would care for them until their father returned.

61.    It did not matter to Doe 1, who had told IESHA clearly, "If you're not going to do your family the favor of telling me the truth about your husband, well then I'm just going to take the kids."

62.    Doe 1 did not in fact immediately take the children, and left them with BRAVO when he transported IESHA to the police station.  When  the children were taken from the home, they were screaming and crying and attempting to wriggle free from the DFCS employee who had come to the scene.

63.    IESHA was placed in a police vehicle driven by Doe 1, and transported to the police station. He continued to harangue IESHA on the way to the station, saying she wasn't doing her children any favors and should admit her husband is a drug addict and abuser.

64.    At the station IESHA submitted a urine sample, but the results of the urine sample were never produced in the subsequent juvenile dependency proceedings, and no criminal proceedings were ever instituted against her for being under the influence of a controlled substance, or for any other crime.

65.    After taking IESHA to the station, Doe 1 returned to the PLAINTIFFS home.  While there, STEPHEN called, unaware of anything that was happening at the home, to advise his wife that he was running a little late from an errand.  Doe 1 answered the phone.

66.    When Doe 1 answered the phone STEPHEN asked him what was going on and Doe 1 insisted he tell Doe 1 who he was.  STEPHEN explained he lived there and Doe 1 told him that his wife had been arrested and that if he didn't get to the house in "two minutes," that he was going to take all of the children.  STEPHEN replied that there was no way he could get

15

there in two minutes, that it might take him 20 or 30 minutes because he was on the east side of San Jose and was waiting for his sister to return with his car from a short trip to a local store. Doe 1 repeated his threat that if he wasn't there in two minutes he was taking all of his children, and then simply hung up on STEPHEN.

67.    A few days later an Officer Boman who was present at some point on the scene when Doe 1 arrested IESHA and took the children into protective custody, without a warrant, and in the absence of any imminent risk of serious bodily injury or consent, approached STEPHEN and his adult son Stephen Jr., and shook their hands and apologized to them for the children being taken. The officer said that he didn't think it was right but that he was not the boss.

68.    On August 24, 2005 Mr. and Mrs. Smith met with social workers, including SEXTON, who they were told was handling the case, and they were told that the matter wasn't going to have to go to court (in juvenile dependency court, Santa Clara County).  However, on August 26th, 2005, Mr. and Mrs. Smith learned that two of their children had already been put into a foster home.

69.    On August 27, 2005, Mr. and Mrs. Smith were advised by SEXTON that the rest of their children had been placed in foster homes.

70.    On August 29, 2005, Mr. and Mrs. Smith voiced their anger and frustration over the fact that their children had been placed in foster homes, and SEXTON made clear that she didn't like the parents disagreeing with her decision, and advised them said that because of it she had decided to have the case sent to court.

71.    The time period under California law for filing a juvenile dependency petition had already passed, as it is 48 hours under California law from the time the children are removed. The family did not appear in court until August 30th, 2005, when they were notified by cell

phone that they had to be in court that very day. It was that day that they learned that their daughter J.S. had been given medical treatment for a toothache on August 29th, 2005, a medical appointment and treatment for which they were given no notice or opportunity to attend, in direct violation of Local Rules of Court and/or Standing Orders of the Santa Clara County Juvenile Court.

72.    At the very first hearing on August 30th, 2005, SEXTON approached STEPHEN and told him in no uncertain terms, that the only way that he was going to get his kids back was if he were to divorce his wife and never speak to her again. SEXTON also told STEPHEN that even if he did get his children back, and she learned in the future that he was speaking with IESHA, she and/or CPS would come out and remove his children again. SEXTON even said to STEPHEN that if he had, "so much as a phone call," with his wife, they would come out and take the children. SEXTON told him it didn't matter if he moved to another country they (CPS) would still be watching him until his children were 18.

73.    STEPHEN was stunned. He told her that if they wanted IESHA to move out of the house for a while that was fine, but that SEXTON had to be crazy to think that he was going to divorce his wife when she, nor he, had done anything wrong at all.

74.    SEXTON continued to make clear that the only way he would get back his children was if he left his wife, and divorced her.

75.    Because SEXTON had only given the parents last minute notice of the hearing on the 30th, it was continued to the next day. At the hearing IESHA offered to the social worker SEXTON to move out of the house, however, SEXTON refused, and again reiterated – though only to STEPHEN – that he would have to divorce IESHA if he wanted to have his children returned, and that either way they were not being returned at that first hearing.

76.    As a result of the fear and tremendous emotional distress these threats instilled in STEPHEN, he moved away from his wife and slept in his vehicle for five nights until he decided that he was not going to let the social worker dictate his marriage to the mother of his children.

73.    T.S., C.S2., and M.S. were placed into foster care with ADAMS. During their time with ADAMS, the family was chosen by the Legal Department of Intuit Corporation as the winners of some kind of charitable event that resulted in the children all receiving a large number of toys and presents.

77.    When the children were returned to live with their parents on September 5th, 2006, Mr. and Mrs. Smith asked the children T.S., C.S2., and M.S. where all their toys and presents were that had been given to them by Intuit. The children replied that ADAMS had not let them ever play with many of the toys, keeping them stored in their original boxes, and the few items that they were allowed to open and play with ADAMS had kept.

78.    Mr. and Mrs. Smith complained to the social worker about the missing toys and presents but they have never been returned.

79.    As a result of the actions and omissions of the aforesaid defendants and those DOE defendants yet unknown to PLAINTIFFS, PLAINTIFFS have suffered, and will continue to suffer into the future, the following damages;

   a.    severe and enduring emotional distress and disruption to their psyche, to such an extent as to cause severe pain and suffering, anger, frustration, loss of appetite, sleeplessness, nausea, headaches, psychosomatic physical symptoms, depression, apathy, general malaise, an enduring sense of mistrust of government officials, hyper-vigilance, embarrassment, and humiliation;

18

b.   medical expenses and mental health counseling / therapy fees incurred in the

past, and certain to be incurred in the future;

80.    Further, the actions of defendants were malicious, oppressive, shocking to the conscious

of the reasonable person, and despicable in the extreme, and as such, entitle plaintiffs, and

each of them, to an award of punitive damages for the sake of example and by way of

punishing the defendants.

### FIRST CLAIM FOR RELIEF

### Warrantless Removal (42 U.S.C. 1983)

### (All Plaintiffs Against Bravo and Doe 1)

81.    PLAINTIFFS reincorporate paragraphs 1 through 78 as though fully set forth at this

point, and as the allegations therein relate to a cause of action for violation of Plaintiffs' civil

rights under the 4th and/or 14th Amendments to the United States Constitution, with regard to

the warrantless removal of the minor children, as against defendants BRAVO and DOE 1.

82.    In removing the minor children, defendants BRAVO and Doe 1 did so without a

warrant, without consent, and did so when there was no imminent risk of serious bodily injury

to any of the minor children.  PLAINTIFFS are unaware, at this time, as to the involvement in

the removal of the children, if any, of any employee of COUNTY, but reserve the right to

amend this complaint to conform to such facts should they become known to PLAINTIFFS in

the future.

83.    PLAINTIFFS re-allege paragraph 79 as said damages relate to a cause of action for a

violation of their civil rights for the warrantless removal of the minor children.

84.    The punitive damage allegations of paragraph 80 apply in this cause of action to

defendants BRAVO and DOE 1.

COMPLAINT
Smith v. San Jose

**SECOND CLAIM FOR RELIEF**

**Continued Detention (42 U.S.C. 1983)**

**(All Plaintiffs Against SEXTON)**

85.    PLAINTIFFS reincorporate paragraphs 1 through 78 as though fully set forth at this point, and as the allegations therein relate to a cause of action for violation of Plaintiffs' civil rights under the 4th and/or 14th Amendments to the United States Constitution, for the continued detention of the minor children, as against defendant SEXTON.

86.    At the time the minor children were taken, and at all times thereafter and inclusive of the filing date of this complaint, the minor children were never in imminent risk of serious bodily injury, nor was consent ever obtained from any lawful parent or guardian to maintain the children separate and apart from their parents and adult brother STEPHEN JR.

87.    PLAINTIFFS re-allege paragraph 79 as said damages relate to a cause of action for a violation of their civil rights for the continued detention of the minor children.

88.    The punitive damage allegations of paragraph 80 apply in this cause of action to defendant SEXTON.

**THIRD CLAIM FOR RELIEF**

**Violation of Association Rights (42 U.S.C. 1983)**

**(Mr. and Mrs. Smith Against SEXTON)**

89.    Mr. and Mrs. Smith reincorporate paragraphs 1 through 78 as though fully set forth at this point, and as the allegations therein relate to a cause of action for violation of said plaintiffs' civil rights under the 1st Amendment to the United States Constitution, as regards the conduct of SEXTON in threatening the loss of all of plaintiff STEPHEN's children if he did not separate and divorce his wife IESHA, as against defendant SEXTON.

20

90.    Mr. and Mrs. Smith re-allege paragraph 79 as said damages relate to a cause of action

for a violation of their civil rights of familial association.

91.    The punitive damage allegations of paragraph 80 apply in this cause of action to

defendant SEXTON.

<b>FOURTH CLAIM FOR RELIEF</b>

<b>Unlawful Search and Seizure (42 U.S.C. 1983)</b>

<b>(IESHA Against BRAVO and Doe 1)</b>

92.    IESHA reincorporates paragraphs 1 through 78 as though fully set forth at this point,

and as the allegations therein relate to a cause of action for violation of Plaintiff's civil rights

under the United States Constitution against false arrest / imprisonment against defendants

BRAVO and DOE 1.

93.    In unlawfully entering the PLAINTIFFS' home, searching through IESHA's personal

belongings without her consent, and using fake substances intended to look like

methamphetamine.

94.    IESHA re-allegesparagraph 79 as said damages relate to a cause of action for false

arrest / imprisonment.

95.    The punitive damage allegations of paragraph 80 apply in this cause of action to

defendants BRAVO and DOE 1.

<b>FIFTH CLAIM FOR RELIEF</b>

<b>Intentional Infliction of Emotional Distress – Violation of Statue - False Claim of Abuse</b>

<b>(Mr. and Mrs. SMITH Against AQUINO)</b>

96.    Mr. and Mrs. SMITH reincorporate paragraphs 1 through 78 as though fully set forth at

this point, and as the allegations therein relate to a cause of action for Intentional Infliction of

21

COMPLAINT
Smith v. San Jose

Emotional Distress against defendant AQUINO, and as related to her violation of a California

statute prohibiting and/or making liable persons who falsely make reports of child abuse.

97.    At all times mentioned, California Penal Cod § 11172 provided in pertinent part that:

*"Any person who makes a report of child abuse known to be false or with reckless disregard*

*of the truth of falsity of the report is liable for any damages caused."*

98.    Commencing on or about August 21st, 2005, for a total three day period, AQUINO

made a series of intentionally or recklessly false child abuse allegations and reports to various

local law enforcement and/or child protection agencies with the purpose, design and intent to

cause Mr. and Mrs. SMITH to lose custody of their children, and/or as part and parcel of a

plan to force an eviction of the plaintiffs herein.

99.    As a direct result of AQUINO'S false child abuse reports, the children were taken from

Mr. and Mrs. SMITH and placed in a shelter and the parents were forced to obtain legal

representation for juvenile proceedings for which no legitimate basis existed.

98.    Mr. and Mrs. SMITH allege that the aforementioned conduct constituted a violation of

Pen. C. 11172, and that foregoing allegations set forth all elements for a cause of action for said

violation against AQUINOS, entitling Mr. and Mrs. SMITH to compensatory damages, and

because the conduct of AQUINO's was despicable, malicious, and oppressive, it entitles Mr. and

Mrs. Smith to punitive damages as set forth in paragraph 80.

100.  Mr. and Mrs. SMITH re-allege paragraph 79 as said damages relate to a cause of action

for Intentional Infliction of Emotional Distress and a Violation of Statute by defendant

AQUINO.

101.  The punitive damage allegations of paragraph 80 apply in this cause of action to

defendant AQUINO.

COMPLAINT
Smith v. San Jose

## SIXTH CLAIM FOR RELIEF

### Trespass

### (Mr. and Mrs. SMITH Against AQUINO)

102.  Mr. and Mrs. SMITH reincorporate paragraphs 1 through 78 as though fully set forth at this point, and as the allegations therein relate to a cause of action for trespass against defendant AQUINO.

103.  AQUINO intentionally and without consent entered Mr. and Mrs. SMITH's property, without consent, thereby causing them damages.

104.  Mr. and Mrs. SMITH re-allege paragraph 79 as said damages relate to a cause of action for trespass.  The punitive damage allegations of paragraph 80 apply in this cause of action to defendant AQUINO.

## SEVENTH CLAIM FOR RELIEF

### Defamation

### (IESHA Against Doe 1)

105.  IESHA reincorporates paragraphs 1 through 78 as though fully set forth at this point, and as the allegations therein relate to a cause of action for Defamation against defendant DOE 1. Doe 1's intentional, false, unprivileged statements about IESHA about allegedly being under the influence of drugs, and a life-time drug addict in the presence of her children, caused her shame, humiliation, and embarrassment, and proximately caused her damages which were the natural and foreseeable consequences of statements of moral turpitude such as those made by Doe 1.

106.  IESHA re-alleges paragraph 79 as said damages relate to a cause of action for defamation.

107.  The punitive damage allegations of paragraph 80 apply in this cause of action to defendant DOE 1.

### EIGTH CLAIM FOR RELIEF

### Conversion

### T.S., C.S.2., and M.S. Against ADAMS

108.  T.S., C.S2, and M.S. reincorporate paragraphs 1 through 78 as though fully set forth at this point, and as the allegations therein relate to a cause of action for conversion against defendant ADAMS.  Plaintiffs T.S., C.S.2, and M.S. had the right to possession of their personal property, in this case their toys, and said rights were intentionally interfered with by defendant ADAMS, causing injury to T.S., C.S.2, and M.S.

109.  T.S., C.S.2, and M.S. re-allege paragraph 79 as said damages relate to a cause of action for conversion.

110.  The punitive damage allegations of paragraph 80 apply in this cause of action to defendant ADAMS.

### NINTH CLAIM FOR RELIEF

### Trespass

### (Mr. and Mrs. SMITH Against AQUINO)

111.  Mr. and Mrs. SMITH reincorporate paragraphs 1 through 78 as though fully set forth at this point, and as the allegations therein relate to a cause of action for trespass against defendant AQUINO.

112.  Mr. and Mrs. SMITH re-allege paragraph 79 as said damages relate to a cause of action for trespass.

113.  The punitive damage allegations of paragraph 80 apply in this cause of action to defendant AQUINO.

24

COMPLAINT
Smith v. San Jose

**PRAYER FOR RELIEF,**

WHEREFORE, Plaintiffs respectfully requests that this Court:

1.)    Award to plaintiffs general, special and compensatory damages in an amount to be proven at trial.

2.)    Award to plaintiffs punitive damages against each of the individual named defendants, and each of them, for their extreme and outrageous conduct in complete disregard for the rights of the plaintiffs;

3.) Award to plaintiffs statutory damages and/or attorney fees against all defendants as allowed pursuant to 42 U.S.C. §1988 and/or C.C.P. §1021.5.

4.) Grant plaintiffs such other and further relief as the Court may deem just and proper.

Dated : 8/21/07

_____
ROBERT R. POWELL, ESQ.
Attorney for Plaintiffs

Plaintiffs demand a jury trial as per Rule 38(a) of the Federal Rules of Civil Procedure.

Dated : 8/21/07

_____
ROBERT R. POWELL, ESQ.
Attorney for Plaintiffs

25

COMPLAINT
Smith v. San Jose